**Ray WHITE, Petitioner**

v.

**PUBLIC SCHOOL EMPLOYEES'
RETIREMENT BOARD,**
Respondent.

Commonwealth Court of Pennsylvania.

Argued June 21, 2010.
Decided Sept. 27, 2010.
Publication Ordered Dec. 9, 2010.

Craig D. Ginsburg, Huntingdon Valley, for Petitioner.

David W. Speck, Harrisburg, for Respondent.

BEFORE: COHN JUBELIRER, Judge, and BUTLER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Ray White (Claimant) petitions for review of an order of the Public School Employees' Retirement Board (Board) denying his request for a "waiver of adjustment" pursuant to Section 8303.1 of the Public School Employees' Retirement Code (Code)[1] to increase his monthly retirement benefit to the payment indicated in an erroneous estimate of monthly retirement benefit he received from the Public School Employees' Retirement System (PSERS) prior to his retirement.

1. 24 Pa.C.S. § 8303.1.

## I. Facts and Procedural Posture

### A. First and Second Retirements

Claimant first retired in December 1994 at the age of 53 1/2 with 31.69 years of service as a member of PSERS. Claimant remained retired from 1994 through May 2002 (First Retirement). At his First Retirement, Claimant selected an accelerated option benefit plan, which has not been offered since that time.[2] Under an accelerated option, a claimant would receive higher monthly retirement payments until he reached age 65, thus accelerating his receipt of benefits, and then the monthly payments would be reduced when he became eligible to receive Social Security benefits. The accelerated option Claimant selected was "Option 2," which provided for a designated survivor to continue to receive a monthly payment after his death.[3] Because the benefit could continue to be paid after Claimant's death, the Option 2 benefit was less than the maximum benefit Claimant would have received had he chosen an option that would not have continued paying a monthly benefit after his death. During his First Retirement, Claimant received accelerated retirement payments of "around $2,200 or $2,300" per month, (Board Findings of Fact (FOF) ¶ 4 (quoting Hr'g Tr. at 21, February 11, 2009, R.R. at 40a)), and admitted that, if he had remained retired, when he reached the age of 65, his benefits would have been reduced to about $1,058. (Hr'g Tr. at 30, R.R. at 49a; Application for Retirement, September 21, 1994, PSERS Ex. 1, R.R. at 115a, 117a.)[4]

In November 2001 and February 2002, Claimant wrote letters to PSERS stating that he planned to return to the work force and requested an estimate of his retirement benefits if he worked at least three more years. In April 2002, a PSERS employee responded to Claimant's requests apologizing "for the delay in responding to your request. Any estimates that deal with the Accelerated Option are very difficult and time consuming." (Letter from

---

2. The accelerated option was part of the 1975 Retirement Code, but was repealed by the Act of April 29, 1994, P.L. 159 (Act No. 1994–26), effective January 1, 1995.

3. Claimant selected "Accelerated Option" as his payment plan on his Application for Retirement when he applied for his First Retirement. (Application for Retirement, September 21, 1994, PSERS Ex. 1, R.R. at 110a.) Selecting the "Accelerated Option" payment plan required Claimant to fill out a form titled "Accelerated Option Benefit Plan," which outlined five different options, and required Claimant to choose one. (Accelerated Option Benefit Plan, September 21, 1994, PSERS Ex. 1, R.R. at 117a.) The five different options for Claimant to choose from included Maximum Single Life Annuity, Option 1, Option 2, Option 3, and Option 4 (Special). Claimant selected Option 2 under the Accelerated Option Benefit Plan, which provides as follows:

Under this option, your monthly benefit is reduced based on your sex and age and the sex and age of your designated survivor annuitant. You will receive an accelerated monthly benefit until age 65. The month following your 65th birthday, your benefit will be reduced for life. At the time of your death, your designated survivor annuitant will receive one-half of the monthly benefit that you would have received.

(Accelerated Option Benefit Plan, September 21, 1994, PSERS Ex. 1, R.R. at 117a.) However, unlike the retirement payment plans offered in 1994, an accelerated option has not been offered since that time.

4. We note that, although Claimant testified that under his First Retirement, his monthly retirement payment would have been reduced to approximately $1,058 when he reached the age of 65, this number was not correct. The record shows that Claimant's final benefit calculation by PSERS on December 6, 2007, indicates that Claimant's adjustment at the age of 65 would have reduced his monthly payment to $1,467.90, not $1,058 because Claimant received a 4.95% Cost of Living Adjustment. (Recomputation of Your Retirement, December 6, 2007, PSERS Ex. 18 at 2, R.R. at 169a; see also FOF ¶ 8 n. 3)

PSERS to Claimant (April 15, 2002), PSERS Ex. 5 at 1, R.R. at 128a (April 2002 Estimate).) The April 2002 Estimate is marked "*ESTIMATE*," and states that "Estimated Cost of Debt to Eliminate the Frozen Present Value—$550,928.32 (With this high a debt, it was not beneficial to use this debt in the calculation—the best benefit is as a Frozen Annuity)." (April 2002 Estimate, PSERS Ex. 5 at 2, R.R. at 129a.) The April 2002 Estimate assumed a retirement date of June 30, 2005 and showed a maximum benefit of **$2,526** with a total lump sum withdrawal of $14,919.95 and a benefit of **$2,080.80** under Option 2, the option Claimant had also elected in his First Retirement. Claimant admitted reading this April 2002 Estimate.

In May 2002, the same PSERS employee prepared a more expanded "Comparison of Benefits" for Claimant (May 2002 Comparison of Benefits), which was consistent with the information contained in the April 2002 Estimate. The May 2002 Comparison of Benefits was e-mailed by PSERS to a member of the General Assembly designated by Claimant, and mailed to Claimant. (E-mail from PSERS to General Assembly (May 14, 2002), PSERS Ex. 7, R.R. at 131a–33a; Letter from PSERS to Claimant (August 30, 2002), PSERS Ex. 9, R.R. at 135a.) Claimant did not recall receiving this May 2002 Comparison of Benefits.

In 2002, Claimant returned to work as an employee of the Fox Chapel Area School District. He was aware that, upon returning to work, he would be subject to an 8.5% penalty on his annuity payments. Claimant retired for the second time on June 30, 2007 (Second Retirement). Prior to his Second Retirement, Claimant received a "normal retirement estimate" of a monthly payment of **$2,733** if Claimant retired on November 1, 2006 and chose a single life annuity and withdrew all of his money from the retirement system. (FOF ¶¶ 13–14 (citing Hr'g Tr. at 12, 26–27, R.R. at 31a, 45a–46a; Normal Retirement Estimate at 2, received February 15, 2006, PSERS Ex. 10, R.R. at 140a).) Because Claimant expected more than this estimate he contacted an official at PSERS, who informed him that he should request a frozen annuity estimate. As such, Claimant twice requested and twice received a frozen annuity estimate from PSERS before his Second Retirement. Claimant received the first frozen annuity estimate in March 2006 (March 2006 Estimate). The March 2006 Estimate assumed a retirement date of November 1, 2006 with a final average salary of $87,000, total service of 36.17 years, and a maximum monthly benefit of **$4,796.80** with withdrawal of contributions and interest. Under Option 2, with a withdrawal of contributions and interest, the monthly benefit was estimated to be **$3,717.96**. (March 2006 Estimate via E-mail, March 23, 2006, PSERS Ex. 12, R.R. at 143a–44a.) Claimant received the second frozen annuity estimate in April 2007 (April 2007 Estimate). The April 2007 Estimate shows a date of retirement of June 29, 2007, with a final average salary of $85,248, total service of 36.69 years, and a maximum monthly benefit of **$4,665.79** with withdrawals of contributions and interest. (April 2007 Estimate, PSERS Ex. 14, R.R. at 151a.) Under Option 2, with withdrawals of contributions and interest, the monthly benefit was estimated to be **$3,584.14**. (April 2007 Estimate, PSERS Ex. 14, R.R. at 151a.) It is undisputed that the March 2006 Estimate and the April 2007 Estimate are grossly inconsistent with the April 2002 Estimate and the May 2002 Comparison of Benefits (jointly, 2002 Estimates).

### B. Retirement Check and Waiver of Adjustment of Error

After Claimant's Second Retirement, he received his first retirement check in Au-

gust 2007 in the amount of "around $4,000." (FOF ¶ 21 (quoting Hr'g Tr. at 18, R.R. at 37a).) Claimant contacted PSERS and was informed that the check he received was for two months, not one month. In September 2007, Claimant contacted PSERS, was told that an error had occurred, and that a final adjustment would be made. On December 6, 2007, PSERS sent a four-page letter to Claimant entitled "Recomputation of Your Retirement" indicating that, as of January 31, 2008, Claimant's *gross* monthly check will be adjusted to $2,751.78." (FOF ¶ 24 (quoting Recomputation of Your Retirement, PSERS Ex. 18 at 1, R.R. at 168a (emphasis in the original)).)

Claimant filed a request with the Executive Staff Review Committee of PSERS that they waive the adjustment of error to his annuity pursuant to Section 8303.1 of the Code. This request was denied and Claimant appealed to the Board. On February 11, 2009, a hearing was held at which Claimant and two PSERS employees appeared and testified. On August 19, 2009, a Hearing Examiner issued a 17–page Opinion and Recommendation (HEO) recommending that Claimant's request for a waiver of the adjustment be denied.

### C. Board's Decision

On September 21, 2009, Claimant filed exceptions to the HEO. The Board reviewed the entire record, and issued an opinion and order affirming the denial of the waiver of the adjustment. The Board found that when someone retires, returns to service, and considers retiring again, a retirement estimate factoring in the debt (i.e., the cost of the initial retirement) is utilized by PSERS. PSERS's typical procedure in determining a benefit estimate under such circumstances is to provide both an estimate that eliminates the debt as well as a frozen annuity estimate. The calculations involving retirement benefits,

frozen annuities, and multiple service requirements are performed by PSERS staff in Harrisburg, PA. There are three complicating factors PSERS staff must consider when preparing a frozen annuity estimate in which an accelerated option benefit plan had been selected for a first retirement, as happened here: (1) cost of living adjustments; (2) legislation known as the Mellow legislation from the 1990s; and (3) the accelerated option (which was available only until December 31, 1994). The Board found that nothing in PSERS' computer system in 2006 and 2007 would show that an active member, such as Claimant, had previously received an accelerated benefit. Moreover, the PSERS employee who prepared the March 2006 Estimate and the April 2007 Estimate, Susan Capozzi, testified that factoring into the equation an accelerated option is not a typical calculation and that, in her ten years of doing calculations, there have only been one or two occasions that she calculated such an estimate. Ms. Capozzi testified that she was not aware that Claimant had chosen the accelerated option for his First Retirement and that she used the amount of the check that Claimant was receiving before he returned to service in 2002 as the basis of the calculation. Ms. Capozzi testified that this is the normal procedure except when someone has received an accelerated option because, in that situation, a claimant's check before he reaches the age of 65 is not a true reflection of what the ultimate benefit will be. The result was that the March 2006 Estimate and the April 2007 Estimate were erroneously inflated.

The Board did not find Claimant credible that he did not recall receiving the May 2002 Comparison of Benefits. As such, the Board found as fact that "Claimant was aware of the estimate amounts

issued by PSERS in 2002." (FOF ¶ 10*.[5]) The Board also found that any reliance on the March 2006 Estimate and the April 2007 Estimate by Claimant was unreasonable in light of the estimates he received in 2002. Based on these factual findings, the Board concluded that Claimant was not entitled to a waiver of the adjustment pursuant to Section 8303.1 of the Code. Disagreeing with the Board's determination that he is not entitled to a waiver of the adjustment of error, Claimant now petitions this Court for review.[6]

## II. Discussion

Pursuant to Section 8534(b) of the Code, the Board must make adjustments to erroneous retirement benefit payments as follows:

(b) Adjustment of errors.—Should any change or mistake in records result in any member, beneficiary, or survivor annuitant receiving from the system more or less than he would have been entitled to receive had the records been correct, then **regardless of the intentional or unintentional nature of the error** and upon the discovery of such error, the board shall correct the error and so far as practicable shall adjust the payments which may be made for and to such person in such a manner that the actuarial equivalent of the benefit **to which he was correctly entitled** shall be paid.

24 Pa.C.S. § 8534(b) (emphasis added). The General Assembly amended the Code in 1998 to allow the Board to waive certain after-retirement account adjustments:

(a) Allowance.—Upon appeal by an affected member, beneficiary or survivor annuitant, the board *may* waive an adjustment or any portion of an adjustment made under section 8534(b) (relating to fraud and adjustment of errors) if in the opinion of the board or the board's designated representative:

(1) the adjustment or portion of the adjustment will cause undue hardship to the member, beneficiary or survivor annuitant;

(2) the adjustment was not the result of erroneous information supplied by the member, beneficiary or survivor annuitant;

(3) **the member had no knowledge or notice of the error before adjustment was made, and the member, beneficiary or survivor annuitant took action with respect to their benefits based on erroneous information provided by the system;** *and*

(4) **the member, beneficiary or survivor annuitant had no reasonable grounds to believe the erroneous information was incorrect before the adjustment was made.**

24 Pa.C.S. § 8303.1(a)(1–4) (emphasis added). As such, Claimant must satisfy all four provisions of this waiver-of-adjustment provision in order to qualify. In this case, the parties agree that Claimant satisfied subsections 1 and 2 of Section 8303.1(a). At issue in this case is whether there is substantial evidence in the record to support the Board's findings that Claim-

---

5. We note that the Board adopted some of the HEO's factual findings; modified other factual findings; rejected and replaced the HEO's factual finding number 20; and added findings of fact 10*, 20*, and 33. The Board placed an asterisk after its findings of fact 10 and 20 for ease of comparison between the HEO's factual findings and its factual findings. (*See* Board Op. at 3 n. 1.)

6. This Court's review of the Board's order is limited to determining whether the Board committed an error of law, whether constitutional rights were violated, or whether necessary factual findings are supported by substantial evidence. *Golebieski v. Public School Employees Retirement Board*, 161 Pa.Cmwlth. 127, 636 A.2d 268, 270 n. 1 (1993).

ant did not meet his burden of proving that he had no knowledge or notice of the error (subsection 3) and that he had no reasonable grounds to believe that the estimates were incorrect before the adjustment was made (subsection 4).

Claimant makes three arguments in support of his request for reversal. First, Claimant argues that he has met the requirements of subsections 3 and 4 of Section 8303.1(a). Second, Claimant argues that the Board erred when it found that there is no requirement that PSERS personnel take "the utmost care ... to make certain that the estimates are as accurate as possible." *Bittenbender v. State Employees' Retirement Board,* 154 Pa. Cmwlth. 11, 622 A.2d 403, 404 n. 1 (1992). Third, Claimant argues that the Board abused its discretion when it determined that the PSERS' employee who provided erroneous retirement estimates to Claimant was not careless.

*A.  Compliance with Section 8303.1*

*1.  Section 8303.1(a)(3)*

■  Claimant first argues that the Board erred in determining that he did not satisfy his burden of proving that he complied with subsection 3 of Section 8303.1(a), specifically, that he had "no knowledge or notice of the error" in the March 2006 Estimate and the April 2007 Estimate "before adjustment was made." 24 Pa.C.S. § 8303.1(a)(3). Claimant contends that he did not suspect that there had been a miscalculation of his retirement benefit until after he received his first check in August 2007. (Hr'g Tr. at 18–19, R.R. at 37a–38a.) Claimant contends that, prior to his Second Retirement, he did everything in his power to secure estimates from PSERS and to verify with his retirement counselor, Mr. Carnegie, that the March 2006 Estimate and the April 2007 Estimate were accurate before he

announced his Second Retirement. (Hr'g Tr. at 15–16, R.R. at 34a–35a.) Additionally, Claimant contends that there is no evidence in the record that the May 2002 Comparison of Benefits was sent to him, or that he received or saw that estimate, which is consistent with his testimony that he did not "recall seeing the comparison of benefits dated May 14, 2002." (Hr'g Tr. at 35, R.R. at 54a.) Moreover, Claimant argues that it is illogical for him to have even relied on the May 2002 Comparison of Benefits because that estimate was not based on accurate information and it was five years old (2002) as opposed to the more current estimates (2006–2007) that he received.

■  Claimant's argument is based on his preferred version of the facts, not on the facts as found by the Board. The law is clear that the Board is the ultimate finder of fact and arbiter of witness credibility. *Dowler v. Public School Employees' Retirement Board,* 153 Pa.Cmwlth. 109, 620 A.2d 639, 641 (1993). As long as the Board's factual findings are supported by substantial evidence those findings are conclusive on appeal. *Id.* at 644. Thus, a claimant's version of the events that is different from the Board's findings is not grounds to reverse the Board's order if there is substantial evidence in the record to support the Board's factual findings. *See Tapco, Inc. v. Unemployment Compensation Board of Review,* 168 Pa. Cmwlth. 292, 650 A.2d 1106, 1108–09 (1994) (That employer may have given "a different version of the events, or ... might view the testimony differently than the Board, is not grounds for reversal if substantial evidence supports the Board's findings.").

Here, the Board found that Claimant received from PSERS the April 2002 Estimate, which Claimant requested, stating that if Claimant reentered the work force

and retired for the second time on June 30, 2005, he would receive a maximum benefit of $2,526 with a total lump sum withdrawal and a benefit of $2,080.80 under Option 2, the option Claimant had elected in his First Retirement. (FOF ¶ 7.) There is support for this factual finding in the record: Claimant testified that the April 2002 Estimate was prepared for him by Linda Tighe of PSERS and that he read the letter. (Hr'g Tr. at 33–34, R.R. at 52a–53a.) Additionally, on May 6, 2002, Claimant sent a letter to PSERS indicating that he planned on reentering the work force in June 2002. (Letter from Claimant to PSERS (May 6, 2002), PSERS Ex. 6, R.R. at 130a.) The Board also found as fact that Claimant "was aware" of additional estimate amounts prepared by PSERS for Claimant in 2002. (FOF ¶ 10*.) This factual finding is related specifically to the May 2002 Comparison of Benefits, which was prepared for Claimant by PSERS, and is consistent with the figures contained in the April 2002 Estimate.[7] Having determined that Claimant was aware of the 2002 Estimates, the Board did not credit Claimant's testimony that he did not "recall seeing the comparison of benefits dated May 14, 2002." (Hr'g Tr. at 35, R.R. at

54a.) In support of this credibility finding, the Board noted that PSERS' records show that on August 30, 2002, the May 2002 Comparison of Benefits was mailed by PSERS to Claimant at the address shown on Claimant's Second Retirement application. (FOF ¶ 9; Enrollment Application, June 28, 2002, PSERS Ex. 8, R.R. at 134a; Letter from PSERS to Claimant (August 30, 2002), PSERS Ex. 9, R.R. at 135a). This letter also reflected a telephone call from PSERS to Claimant in August 2002. Additionally, Claimant testified that in 2002 he contacted Representative Jess Stair's office about trying to get a comparison of benefits, and the record shows that the May 2002 Comparison of Benefits was e-mailed to Representative Stair's office on May 14, 2002. (Hr'g Tr. at 37–38, R.R. at 56a–57a; E-mail from PSERS to General Assembly, May 14, 2002, PSERS Ex. 7, R.R. at 131a.) Although Claimant could not recall how that information was communicated to him from Representative Stair's office, he did remember that he "talked with Jess a couple of times." (Hr'g Tr. at 38, R.R. at 57a.)

This evidence of record supports the Board's finding that there existed a "com-

---

7. The May 2002 Comparison of Benefits indicates a return to service date of September 1, 2002, and alternative retirement dates of June 30, 2005 and June 30, 2008. (Comparison of Benefits, May 14, 2002, PSERS Ex. 7, R.R. at 132a–33a.) This document, consistent with the information contained in the April 2002 Estimate, shows a maximum benefit of $2,526 calculated as a frozen annuity if the retirement date is June 30, 2005. (Comparison of Benefits, May 14, 2002, PSERS Ex. 7, R.R. at 132a; April 2002 Estimate, PSERS Ex. 5 at 2, R.R. at 129a.) The May 2002 Comparison of Benefits also shows a maximum of $3,174.80 calculated as a frozen annuity if the retirement date is June 30, 2008. (Comparison of Benefits, May 14, 2002, PSERS Ex. 7, R.R. at 132a–33a.) Assuming a retirement date of June 30, 2005, the May 2002 Comparison of Benefits shows a frozen annuity benefit under

Option 2 of $2,080.80; and, assuming a retirement date of June 30, 2008, the May 2002 Comparison of Benefits shows a frozen annuity benefit under Option 2 of $2,587.80. (Comparison of Benefits, May 14, 2002, PSERS Ex. 7, R.R. at 132a–33a.) This document also notes that, under Claimant's then current accelerated option, Claimant's annuity would drop to $1,058.53 at the age of 65. (Comparison of Benefits, May 14, 2002, PSERS Ex. 7, R.R. at 132a–33a.) As previously discussed in footnote 4, this amount was incorrect; however, as the Board found, this just "makes the discrepancy in the [April 2007 Estimate] even more evident. It should also be noted that, even with the corrected amount, the benefit Claimant is receiving is close to double what he would have received had he not returned to service. ([Hr'g Tr. at 69–71, R.R. at 88a–90a])." (FOF ¶ 8 n. 3.)

pelling inference that Claimant returned to work in 2002 based on the [2002 Estimates] he received from PSERS and that he knew at that time that his annuity at age 65 if he returned to work would be in the range of $2,500 rather than the $1,100 he then had to anticipate." (Board Op. at 20.) In other words, the evidence of record is sufficient to support the Board's finding that Claimant was aware of the two estimates he received in 2002, (FOF ¶ 10*), which were considerably lower than the March 2006 Estimate and the April 2007 Estimate. Thus, the obvious disparities between the 2002 Estimates and those prepared for Claimant in March 2006 and April 2007, and between the amount that Claimant would have received at age 65 if he did not return to work ($1,058.53) and the amount that he would receive under Option 2 after working only four years (up to $3,717.96), supports the Board's finding that Claimant did not prove that he had "no knowledge or notice of the error before adjustment was made" per Section 8303.1(a)(3) of the Code.

### 2. Section 8303.1(a)(4)

Claimant also argues that the Board erred in concluding that Claimant did not prove that he met subsection 4 of Section 8303.1(a), which requires that Claimant "had no reasonable grounds to believe the erroneous information was incorrect before the adjustment was made." 24 Pa.C.S. § 8303.1(a)(4). Claimant contends that he had reasonable and common-sense grounds to rely on the March 2006 Estimate and the April 2007 Estimate before retiring because: those estimates were based on accurate information supplied by Claimant; Claimant believed that any and all penalties from his First Retire-

ment had already been taken into account; Claimant believed that the March 2006 Estimate and the April 2007 Estimate were reasonable based on payments from his First Retirement, the length of his return to service, his most recent salary information, and his 37 years of service; and Mr. Carnegie confirmed on at least two occasions that these estimates were accurate.[8] Moreover, Claimant argues that the factual finding that he should have inquired about the discrepancies between the 2002 Estimates and the March 2006 Estimate and the April 2007 Estimate is erroneous because the statute places no such requirement on a claimant.

We agree with Claimant that there is no statutory requirement that Claimant specifically question disparities in estimates prepared by PSERS. However, Claimant received inflated estimates in March 2006 and April 2007 and never apparently raised a concern that these estimates were inconsistent with the 2002 Estimates he received from PSERS, even though he was aware that, because he took the accelerated option in 1994, his annuity would drop considerably when he reached age 65. (Hr'g Tr. at 30, R.R. at 49a; Comparison of Benefits, May 14, 2002, PSERS Ex. 7, R.R. at 132a–33a.) As the Board points out, the April 2007 Estimate showed a monthly benefit that was nearly double the correct frozen annuity benefit that was provided to Claimant in 2002, and nearly quadruple the monthly annuity Claimant would have received under the accelerated option at age 65 had he not returned to service. As such, even if Claimant relied on Mr. Carnegie's confirmation that the March 2006 Estimate and the April 2007 Estimate were correct, the amounts of

8. Mr. Carnegie testified that he thought the April 2007 Estimate was accurate because the work of the Exception Processing Center, which prepares the frozen annuity estimates, is "typically ... perfect, for one, and the number seemed to not be completely out of line, so I assumed this was [a] correct estimate." (Hr'g Tr. at 57, R.R. at 76a.)

these estimates were sufficiently disparate enough from the 2002 Estimates for Claimant to reasonably question the accuracy of all of the estimates provided to him since 2002. At the very least, Claimant should have raised this specific concern regarding the disparity in all of the estimates he received since 2002 with Mr. Carnegie. Therefore, the Board did not err in concluding that Claimant failed to prove that he "had no reasonable grounds to believe the erroneous information was incorrect before the adjustment was made" pursuant to Section 8303.1(a)(4) of the Code.

### B. "Utmost Care"

■ Second, Claimant argues that the Board erred in disregarding this Court's language in *Bittenbender*, which disapproved carelessness on the part of state employees preparing estimates on which potential retirees rely. The relevant discussion in *Bittenbender* is as follows:

Bittenbender, a 62–year old Superintendent of District 5 of the Turnpike Commission, who had been employed by the Commission in excess of fourteen years, considered retirement. He consulted with a SERS retirement counselor assigned to the Turnpike Commission to ascertain whether the "numbers" were suitable for retirement, since he had concluded he needed an income of $18,000 a year to retire (which included his Social Security and his retirement benefits). He obtained a retirement estimate under Option 3 which would pay one-half of such retirement benefit to his widow and which met his needs. He then retired. About three months later, he was advised the estimate he reviewed was in error and that instead of receiving $1017.67 a month, he would be receiving $778.94 or $238.73 per month less.[1]

[1] We, of course, do not approve of what occurred in this case. SERS is required by statute to give counseling to prospective retirees. Section 5906 of the State Employees Retirement Code, Act of March 1, 1974, P.L. 125, 71 Pa.C.S. § 5906(f). *At this important time of the employee's life, the utmost care should be taken to make certain that the estimates are as accurate as possible.* The brief for the Board (p. 39) suggests the mistake was "but" a mathematical error on the part of the Turnpike Commission's retirement counselor. *We strongly suggest that these estimates be checked by some retirement system personnel other than the counselor before the employee retires, not after he retires.* We also note that the employee had retained a "financial advisor" who could have checked and easily ascertained the error. The error is found at p. 122 of the reproduced record, where an amount was added in twice to figure out the annual pension.

*Bittenbender,* 622 A.2d at 404 (emphasis added). Claimant argues that contrary to the Board's statement that the italicized language in footnote 1 was merely an expression of "a desired goal, not a legal standard," (Board Op. at 17), this language that employees should use the "utmost care" in calculating estimates is a directive, and not a mere suggestion offered by the Court. As such, Claimant contends that Ms. Capozzi, who calculated the erroneous March 2006 Estimate and the April 2007 Estimate, should be held accountable and should not be excused for her actions by simply saying she did not know that Claimant was an accelerated retired annuitant.

PSERS provided Claimant with erroneous estimates in March 2006 and April 2007, which Claimant considered before his Second Retirement, and which we, like the *Bittenbender* Court, do not condone. However, we must agree with the Board that the "utmost care" language in *Bittenbender* is dicta and an expression of a desired goal, not a legal standard. Importantly, Section 8534(b) of the Code does not use the "utmost care" language in

describing adjustment in errors, and specifically permits the Board to adjust the error whether the error by PSERS was intentional or unintentional. 24 Pa.C.S. § 8534(b). This Court's expression of concern for retirees who rely on estimates provided to them by PSERS to determine whether it is financially appropriate to retire at a certain time cannot trump the statutory standards. Accordingly, we must follow the statute, and cannot agree with Claimant's argument that the Board disregarded a directive by this Court.

### C. Careful Estimates by PSERS

■ Finally, Claimant argues that the Board abused its discretion when it determined that Ms. Capozzi was not careless when calculating Claimant's March 2006 Estimate and the April 2007 Estimate. Claimant argues that the record shows that Ms. Capozzi failed to thoroughly examine Claimant's retirement record, which noted that he was an accelerated option annuitant, prior to issuing the March 2006 Estimate and the April 2007 Estimate. As such, he disagrees with the Board that he was "the only one who had the ability to recognize the large discrepancy and inquire about it." (Board Op. at 18.) We disagree with Claimant that the Board abused its discretion.

■ The Board noted in the discussion section of its opinion that "the errors made [in the March 2006 Estimate and April 2007 Estimate] were clearly not based on any 'carelessness' on the part of the persons who made the estimates, and the Hearing Examiner acknowledged that they were 'unintentional.'" (Board Op. at 17 (quoting HEO at 14).) In making this statement, the Board impliedly credits the testimony of Ms. Capozzi that, under the circumstances, there was no way for her to know at the time she formulated the March 2006 Estimate and the April 2007 Estimate that Claimant had previously retired in 1994 with an accelerated retirement option because that information was neither available on PSERS' computer system, nor was that information contained in Claimant's "return to service package," which is PSERS' paperwork documenting that a member has returned to work.[9] (Hr'g Tr. at 66–67, R.R. at 85a–86a.) Instead, the Board found that Claimant knew that he chose the accelerated option under his First Retirement and that he was the "only one who had the ability to recognize the large discrepancy and inquire about it, and he did nothing." (Board Op. at 18.) However, whether Ms. Capozzi was careless or not in making her estimates would not preclude the Board from making an adjustment in the error because adjustments must be made whether the error was intentional or unintentional (See 24 Pa.C.S. 8534(b))(stating "regardless of the intentional or unintentional nature of the error ....."), and an error can also be adjusted in a situation where a PSERS' employee made a miscalculation that could have been easily caught. See Bittenbender, 622 A.2d at 404 n. 1 (finding that the mistake was a mathematical error on the part of the retirement counselor, and that the mistake is readily noticeable in that an "amount was added in twice to figure out the annual pension").

### III. Conclusion

Because we conclude that the Board did not commit an error of law or abuse its

9. We note that the Board does not mention Ms. Capozzi's testimony on cross-examination that she "should have noticed that [Claimant's retirement check before he returned to service] was a temporary check and not a check that could be used in unfreezing his benefit for the future retirement." (Hr'g Tr. at 72–73, R.R. at 91a–92a.)

discretion, we are constrained to affirm the Board's order.[10]

### ORDER

**NOW,** September 27, 2010, the order of the Public School Employees' Retirement Board in the above-captioned matter is hereby **affirmed.**

10. Because of our disposition, we need not address the Board's alternative argument that the erroneous estimates do not constitute a "mistake in records" under Section 8534(b) of the Code that would permit a waiver of the adjustment pursuant to Section 8303.1 of the Code.